# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| CATALYST PAPER CORPORATION, et al.[1] | Case No. 16-12419 (CSS) |
| Debtors in a foreign proceeding. | (Joint Administration Requested) |

## VERIFIED PETITION FOR ENTRY OF AN ORDER RECOGNIZING FOREIGN MAIN PROCEEDING AND GRANTING ADDITIONAL RELIEF

Catalyst Paper Corporation ("CPC" or "Catalyst")), in its capacity as the authorized foreign representative (the "Foreign Representative") for itself and its above-captioned affiliates (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company") in a proceeding (the "CBCA Proceeding") under Section 192 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 (as amended, the "CBCA") before the Supreme Court of British Columbia (the "Canadian Court"), submits: (a) the chapter 15 petitions of the Debtors filed contemporaneously herewith (the "Chapter 15 Petitions"); and (b) this verified petition (the "Verified Petition") requesting entry of an order, in substantially the form attached hereto as Exhibit A (the "Recognition Order"), (i) recognizing the CBCA Proceeding as a foreign main proceeding pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code"); (ii) recognizing CPC as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code, in respect of the CBCA Proceeding; (iii) giving full force and effect in the

---

[1] The chapter 15 debtors incorporated in Canada and/or in the province of British Columbia (collectively, the "Canadian Debtors"), along with the last four digits of each Canadian Debtor's Canadian business number, are: Catalyst Paper Corporation (1171); Catalyst Paper (6288); Catalyst Pulp Operations Limited (4565); Catalyst Pulp Sales Inc. (4021); Catalyst Pulp and Paper Sales Inc. (2085); and Pacifica Poplars Ltd. (6048). The chapter 15 debtors incorporated in the United States (collectively, the "U.S. Debtors"), along with the last four digits of each U.S. Debtor's federal tax identification number, are: Catalyst Paper Holdings Inc. (7177); Catalyst Paper Operations Inc. (7105); Catalyst Paper (Snowflake) Inc. (7015); Catalyst Paper (USA) Inc. (6890); Pacifica Papers US Inc. (7595); Pacifica Papers Sales Inc. (7594); Pacifica Poplars Inc. (9597); and Catalyst Paper Recycling Inc. (8358). The Canadian Debtors and the U.S. Debtors are referred to herein, collectively, as the "Debtors." The Debtors' executive headquarters are located at: 2nd Floor, 3600 Lysander Lane, Richmond, BC V7B 1C3, Canada.

United States to any and all orders that have been or will be made or entered in the CBCA

Proceeding, including without limitation the Preliminary CBCA Order (as defined below) and

any forthcoming interim order and final order approving the restructuring transaction to be

effected through the CBCA "arrangement" (collectively, the "Canadian Orders"), including any

extensions or amendments thereof authorized by the Canadian Court; (iv) applying section

365(e) of the Bankruptcy Code in these Chapter 15 Cases pursuant to sections 105(a), 1507 and

1521 of the Bankruptcy Code; and (v) granting such other and further relief as this Court deems

just and proper.  In support of the Verified Petition, the Foreign Representative submits the

*Declaration of Stew Gibson in Support of Chapter 15 Petitions and First Day Pleadings* (the

"Gibson Declaration"), the *Declaration of Guy P. Martel in Support of Verified Petitions for

Recognition and Chapter 15 Relief* (the "Martel Declaration") and the *Foreign Representative's

Memorandum of Law in Support of Verified Chapter 15 Petitions and Orders Granting

Provisional and Final Relief* (the "Memorandum of Law"), each filed contemporaneously

herewith and incorporated by reference.  In further support of this Verified Petition and request

for related relief, the Foreign Representative respectfully represents as follows:

## PRELIMINARY STATEMENT[2]

1.      CPC, the ultimate parent company of all of the Debtors, is a publicly traded

company incorporated under the CBCA which, through its 23 direct and indirect subsidiaries and

a general partnership interest, produces and sells pulp and paper products in North America,

Asia, Australia, and Latin America.  Headquartered in Richmond, British Columbia, the Debtors

are a consolidated business enterprise comprised of various manufacturing, sales, and

distribution facilities and offices in Canada and the United States that are operationally and

---

[2] Capitalized terms used in this Preliminary Statement but not yet defined have the meanings ascribed to them in subsequent sections of this Verified Petition.

functionally integrated.  The Debtors are the largest producer of mechanical printing papers in Western North America and the largest producer of coated groundwood paper in North America.  CPC and certain of its wholly-owned direct and indirect subsidiaries, including the Chapter 15 Debtors, commenced the CBCA Proceeding on October 31, 2016.

2.     The Recapitalization Plan.  On October 30, 2016, CPC entered into a support agreement (the "Support Agreement") with certain of its principal stakeholders holding or controlling approximately 69.6% of its outstanding common shares and approximately 86.7% of the outstanding Secured Notes (collectively, the "Supporting Securityholders") pursuant to which the Supporting Securityholders have agreed to support a recapitalization transaction (the "Recapitalization Transaction").  The principal terms of the Recapitalization Transaction include that:

- existing Secured Notes (including interest scheduled to be paid on November 1) with an aggregate principal amount outstanding of US$260.5 million would be exchanged for interests in a new 5-year US$135 million term loan plus common shares of CPC representing 95% of the outstanding number thereof after giving effect to such conversion;

- existing credit facilities would remain in place subject to certain amendments, including extension of maturities, all conditioned upon the agreement of the ABL Lenders and Term Loan Lenders;

-  CPC and the Supporting Securityholders would cooperate to structure/negotiate the terms by which certain of the common shares not held by such Supporting Securityholders would be exchanged for cash consideration payable by CPC or otherwise repurchased by CPC, subject to certain conditions (completion of any such exchange would not be a condition to the Recapitalization Transaction); and

- all other obligations of CPC, including to its trade creditors, suppliers, customers and employees would remain unaffected and would be paid or satisfied in the ordinary course.

The Support Agreement also permits CPC to terminate the Support Agreement  if its Board of Directors determines that, as a result of its fiduciary duties or other legal requirements, it does

not intend to, and/or will not, approve or cause to permit CPC to pursue or consummate the Recapitalization Transaction..

3.        The Potential Acquisition Plan.  As described further below, CPC and the Principal Securityholders (including the Supporting Securityholders) also have been and continue to be in discussions with Kejriwal Group International ("KGI")  in connection with a potential acquisition transaction (the "KGI Acquisition").  If and when an agreement between Catalyst and KGI is reached regarding the KGI Acquisition, Catalyst may choose to submit concurrently a plan of arrangement involving the KGI Acquisition (the "Acquisition Plan")  and the Recapitalization Plan. In such a scenario, it is expected that the Recapitalization Plan would become an alternative to the Acquisition Plan and would only be implemented in the event that the KGI Acquisition was not completed.

4.        The CBCA Proceeding.  The primary purpose of the CBCA Proceeding is to effect the Recapitalization Transaction through a plan of arrangement (the "Recapitalization Plan"), consistent with the requirements of the CBCA.  Similar to a "prepackaged" case in the U.S., the Recapitalization Plan impacts only the Secured Note holders and equity holders, and is a largely consensual transaction.[3]  The claims of all other creditors, including employees, trade vendors, contract counterparties and litigants, are unaffected by the Recapitalization Plan (and also would be unaffected by the Acquisition Plan) and CPC will continue to pay such creditors in the ordinary course.

5.        The Chapter 15 Cases.  The Foreign Representative has commenced the Chapter 15 Cases to request the assistance of this Court in giving effect in the United States to the CBCA Proceeding and the Canadian Orders and to assist the Canadian Court in connection with the

---

[3] The extensions of, and related amendments to, the ABL Facility and Term Loan, which are required by the Recapitalization Plan would be a condition of the transaction and completed on a fully consensual basis.

restructuring of the Debtors.  The Canadian Orders should be recognized and enforced in the United States in order to eliminate the risk of litigation in the United States by certain creditors in contravention of the Canadian Orders and to permit the orderly implementation of the CBCA Proceeding and, ultimately, any plan of arrangement approved by the Canadian Court.  By this Verified Petition, the Foreign Representative requests the assistance of this Court to promote the finality of this restructuring by: (a) recognizing the CBCA Proceeding as a foreign main proceeding, or in the alternative, recognizing the CBCA Proceeding as a foreign main proceeding with respect to the Canadian Debtors and recognizing the CBCA Proceeding as a "foreign nonmain proceeding" with respect to the U.S. Debtors; (b) recognizing CPC as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code, in respect of the CBCA Proceeding; (c) giving full force and effect in the United States to the plan of arrangement and the Canadian Orders pursuant to the CBCA Proceeding (as may be extended, modified or amended by the Canadian Court); and (d) granting certain related relief.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code have been designated core matters under 28 U.S.C. § 157(b)(2)(P).

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1410.

8.      The statutory predicates for the relief requested in this Verified Petition are sections 105(a), 362, 365, 1501, 1517, 1521, and 1525 of the Bankruptcy Code.

**BACKGROUND**

A.      **The Debtors' Business**

9.       As set forth in the Gibson Declaration, the Debtors are operated on a consolidated basis and directed from their headquarters located in Richmond, British Columbia.  The Debtors' corporate governance and centralized senior management, finance, and human resource functions are managed from Richmond.  The Debtors operate three paper mills in British Columbia, located in Crofton, Port Alberni and Powell River, and two additional paper mills in the United States, located in Biron, Wisconsin, and Rumford, Maine.  The Debtors' business is comprised of four segments: (a) coated paper, (b) uncoated paper, (c) newsprint, and (d) pulp.  As of 2015, the coated paper segment accounted for 52% of sales revenue on a consolidated revenue basis, uncoated paper generated 19% of sales, newsprint represented 12%, and pulp sales made up the remaining 17%.

10.       With respect to the relative scope of operations between the United States and Canada, more than three-quarters of the Debtors' fixed assets (i.e., property, plants and equipment) are located in Canada, while less than one-quarter are located in the United States. Similarly, although precise sales figures are difficult to allocate between Canada and the United States due to the Debtors' centralization of sales operations, an estimated 60% of sales relate to products manufactured in Canada.

11.       CPC's common stock is listed on the Toronto Stock Exchange.  CPC's primary asset in the United States is its 100% equity ownership of Catalyst Paper Holdings Inc. ("Catalyst Paper Holdings"), a Delaware corporation through which the Company conducts substantially all of its operations in the United States.

B.    **The Debtors' Corporate and Capital Structure**

12.    The Company's corporate structure is set forth in Exhibit B to the Gibson

Declaration.  CPC is a corporation organized under the CBCA.  It is the parent company of the

enterprise and directly controls 100% of the common equity of almost all of the Canadian

Debtors, as well as Catalyst Paper Holdings, which directly or indirectly controls the U.S.

Debtors.  It is also a general partner in a general partnership, Catalyst Paper, which was formed

between CPC and Debtor Catalyst Pulp Operations Limited.

13.    The principal debt obligations of the Debtors are comprised of credit facilities and

public debt obligations described in more detail below.  All of the Canadian Debtors and U.S.

Debtors Catalyst Paper Holdings, Catalyst Paper (USA) Inc., Pacifica Poplars Inc., Pacifica

Papers Sales Inc., Pacifica Papers US Inc., Catalyst Paper Operations Inc., and Catalyst Paper

(Snowflake) Inc. (collectively with CPC, the "Loan Parties") are co-borrowers and/or guarantors

with respect to CPC's debt facilities described below.

14.    ABL Facility.  Upon the completion of its 2012 Canadian Proceeding (defined

below), CPC and other Loan Parties entered into a credit agreement (as amended and restated,

the "ABL Credit Agreement") which currently provides for a revolving facility of up to

C$250,000,000 and letter of credit facilities made available to CPC to provide it with necessary

liquidity and working capital for general corporate matters (the "ABL Facility").  The obligations

under the ABL Credit Agreement are secured by a first priority charge on the current assets of

the Loan Parties, and a second priority charge on the fixed assets of the Loan Parties.  As of June

30, 2016, the amount drawn on the ABL Facility by CPC amounted to approximately C$134.3

million and approximately C$24.1 million in outstanding letters of credit.

15.    Term Loan.  On March 20, 2014, CPC entered into a term loan credit agreement

(as amended, the "Term Loan Credit Agreement") providing for a C$20 million term loan (the

"Term Loan") bearing interest at the Canadian Prime Rate plus 3%.  The obligations under the

Term Loan Credit Agreement are secured by a first priority charge on the fixed assets of the

Loan Parties and a second priority charge on the current assets of the Loan Parties.  As of June

30, 2016, an amount of approximately C$15.1 million remained outstanding under the Term

Loan Credit Agreement, which is currently scheduled to mature on July 31, 2017.

16.     Secured Notes.  CPC issued a series of secured notes known as the "PIK Toggle

Senior Secured Notes" due on October 30, 2017 (the "Secured Notes").  The obligations of CPC

in connection with the Secured Notes are guaranteed by the Loan Parties and secured by the first

priority charge on the fixed assets of the Loan Parties and the second priority charge on the

current assets of the Loan Parties which secure the obligations under the Term Loan Credit

Agreement.  The obligations of the Loan Parties in connection with the Secured Notes rank

subordinate to the obligations owed in connection with the Term Loan Credit Agreement.  As of

June 30, 2016, the total indebtedness under the Secured Notes amounted to approximately

C$335.0 million.  Interest is payable at a rate of 11% per annum (or at a rate of 13% per annum,

of which 7.5% per annum shall be payable by cash and 5.5% per annum shall be payable in the

form of additional Secured Notes), and the next interest payment of approximately

US$14,327,500 is due on November 1, 2016 (the "November 1 Interest Payment").[4]

17.     Trade Debt. The amount owing on trade payables fluctuates during the course of

any given month. As of June 30, 2016, the Debtors had unsecured trade debt in the approximate

amount of $158.6 million resulting from trade supply obligations arising in the normal course.

---

[4] Given the current circumstances, the Debtors have determined that it is in their best interest and the best interest of all their stakeholders not to make the November 1 Interest Payment to the holders of the Secured Notes (the "Noteholders").  The Support Agreement provides that the principal and certain accrued interest on the Secured Notes, including the November 1 Interest Payment, will be exchanged for interests in a new term loan and common stock of CPC, as described above.

C.    **Events Leading to the CBCA Proceedings**

18.    CPC and its affiliates previously filed chapter 15 proceedings in 2012 (the "2012 Chapter 15 Proceeding") in the United States Bankruptcy Court for the District of Delaware (Case No. 12-10221 (PJW)) (the "Bankruptcy Court") to recognize restructuring proceedings commenced in Canada pursuant to the CBCA, which ultimately converted to a proceeding under Canada's Companies' Creditors Arrangement Act (the "2012 Canadian Proceeding").  In the 2012 Chapter 15 Proceeding, the Bankruptcy Court entered a final order (i) finding that British Columbia, Canada, was the center of main interest for the debtors, (ii) recognizing the 2012 Canadian Proceeding as a "foreign main proceeding", (iii) acknowledging CPC as the duly appointed foreign representative for the 2012 Canadian Proceeding, and (iv) recognizing the plan of arrangement approved and implemented through the 2012 Canadian Proceeding and granting all relief afforded to a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code. See In re Catalyst Paper Corp., Case No. 12-10221 (PJW) (Bankr. D. Del. Mar. 5, 2012) [D.I. 89].

19.    Since its comprehensive restructuring proceeding in 2012 and as further detailed in the Gibson Declaration, the Debtors have continued to face increasingly challenging business conditions as the demand for, and price of, traditional printing and writing papers has continued to experienced declines in the past years.  Although the Debtors generally continue to meet their obligations as they come due, the Debtors have nevertheless incurred significant losses in recent years.

20.    In May 2016, CPC received a copy of an expression of interest among KGI and certain principal securityholders of CPC (including the Supporting Securityholders) representing 79.6 % of the outstanding common shares of CPC and 86.9% of the Secured Notes (the "Principal Securityholders") regarding the proposed KGI Acquisition.  The principal terms of the

KGI Acquisition include that: (i) KGI would acquire all outstanding common shares of CPC except for those held by the Principal Securityholders and the directors of Catalyst (which would be converted into a new junior convertible term loan), (ii) the Secured Notes would be converted into new indebtedness, (iii) KGI would make certain equity investments in Catalyst, and (iv) trade and other obligations would remain unaffected.  CPC believed that the proposal could provide the Debtors with a significant amount of capital to enhance and accelerate the Debtors' planned growth initiatives, and retained the services of Houlihan Lokey Capital, Inc. to assist it in the review of the proposed KGI Acquisition as well as other strategic alternatives, including a potential financial restructuring or reorganization.  On June 30, 2016, the Principal Securityholders entered into a support agreement (the "KGI Acquisition Support Agreement") with KGI in connection with the KGI Acquisition pursuant to which the Principal Securityholders committed to support and vote in favor of the KGI Acquisition, subject to certain material conditions and other provisions.

21.     Upon being informed of the expression of interest in May 2016, CPC, with the assistance of legal and financial advisors, began its review and evaluation of the proposed KGI Acquisition and thereafter of the process contemplated by the KGI Acquisition Support Agreement.  CPC worked diligently and fully cooperated in advancing the KGI Acquisition process, including allowing due diligence in respect of its business and affairs, providing access to KGI and its advisors to a virtual data room, organizing site visits, arranging for meetings with its lenders, and reviewing and negotiating the terms of definitive documentation.

22.     Consistent with its fiduciary duties and taking into account the interests of Catalyst's stakeholders, CPC requested that the Principal Securityholders consider proposing or supporting a possible alternative recapitalization transaction, in the event that the KGI

Acquisition were not completed.  Therefore, on October 30, 2016, CPC and the Supporting

Securityholders entered into the Support Agreement pursuant to which such stakeholders have

agreed to support the Recapitalization Transaction.  Given its complex nature, the

Recapitalization Transaction would have to be effected by way of a plan of arrangement under

the CBCA.

23.     Notwithstanding the execution of the Support Agreement, Catalyst, the Principal

Securityholders and KGI are in continuing discussions regarding the KGI Acquisition.  If and

when an agreement between Catalyst and KGI is reached in connection with this transaction,

Catalyst may choose to submit concurrently the Acquisition Plan and the Recapitalization Plan.

In such a scenario, it is expected that the Recapitalization Transaction would become an

alternative to the KGI Acquistion and would only be implemented in the event that the KGI

Acquisition was not completed.  Catalyst seeks either to reach an agreement in respect of the sale

of its business to a willing purchaser such as KGI who can fund the operations of the Company

going forward, or restructure its capital in order to be able to move forward with its business with

enhanced liquidity.

24.     In the course of its discussions with the ABL Lenders to obtain a waiver of certain

defaults that could arise under the ABL Credit Agreement as a result of, *inter alia*, CPC's

decision to defer the November 1 Interest Payment and the commencement of these proceedings,

CPC has requested that the ABL Lenders consider, and CPC intends to negotiate with the ABL

Lenders, certain amendments to the ABL Facility, including an extension of the term thereof, in

order to facilitate the Recapitalization Transaction.  As at the date of this petition, no amending

agreement has yet been entered into with the ABL Lenders.  CPC has taken similar steps with the

Term Loan Lenders.

01:19474246.1

11

### D.    The Terms of the Preliminary CBCA Order and Recapitalization Plan

25.    CPC and the other Debtors commenced the CBCA Proceeding to effect the Recapitalization Plan.  Pursuant to the CBCA, on October 31, 2016, the Canadian Court entered a preliminary order (the "Preliminary CBCA Order") (i) authorizing the Debtors to apply for entry of an interim order permitting CPC to call, hold and conduct special meetings of the Noteholders and its shareholders to consider and vote upon the Recapitalization Plan (and the Acquisition Plan, if applicable), (ii) staying the continuation or commencement of any actions or proceedings against or in respect of the Debtors or any of the debtors' property and other assets, and (iii) authorizing CPC to act as the Foreign Representative for purposes of applying for recognition of the CBCA Proceeding in a jurisdiction outside of Canada.[5]

26.    As detailed in the Martel Declaration, in the CBCA Proceeding the Debtors' assets and affairs are subject to the supervision of the Canadian Court during the pendency of such CBCA Proceeding.  Any party-in-interest seeking to object to the Recapitalization Plan may appeal to the Canadian Court.  The Canadian Court, through the CBCA Proceeding, is properly exercising its jurisdiction over the Canadian Debtors and the U.S. Debtors, as provided under section 192 of the CBCA.  Pursuant to the CBCA, the Canadian Court concluded in the Preliminary CBCA Order that the Canadian Debtors and U.S. Debtors are "party to [the CBCA] proceedings," and granted a stay for the protection of all of the Debtors and their assets. Preliminary CBCA Order at ¶¶ 5–7.

### E.    Commencement of the Chapter 15 Cases

27.    On the date hereof (the "Petition Date"), the Foreign Representative commenced these Chapter 15 Cases by filing the Chapter 15 Petitions pursuant to sections 1504 and 1515 of

---

[5] A certified copy of the Preliminary CBCA Order is attached to the Gibson Declaration as Exhibit A.

the Bankruptcy Code (collectively, the "Chapter 15 Cases") in order to, among other things, seek

recognition of the CBCA Proceeding and the Preliminary CBCA Order entered by the Canadian

Court.  Concurrently with the filing of this Verified Petition, the Foreign Representative has

requested joint administration and procedural consolidation of these Chapter 15 Cases pursuant

to Bankruptcy Rule 1015(b).

## RELIEF REQUESTED

28.     The Foreign Representative requests entry of the Recognition Order, in

substantially the form attached hereto as Exhibit A, granting the following relief:

(a)  recognizing the CBCA Proceeding as a foreign main proceeding under section
1517 of the Bankruptcy Code, or, in the alternative and with respect to
recognition only, recognizing the CBCA Proceeding as a foreign main
proceeding with respect to the Canadian Debtors and a foreign nonmain
proceeding with respect to the U.S. Debtors;

(b)  automatic relief as of right upon recognition of a foreign main proceeding
pursuant to section 1520 of the Bankruptcy Code, including, but not limited
to, the automatic stay provided for by section 362 of the Bankruptcy Code
(provided that such relief would not apply to the ABL Lenders and the Term
Lenders);

(c)  applying section 365(e) of the Bankruptcy Code pursuant to section 1521 of
the Bankruptcy Code as additional relief;

(d)  recognizing CPC as the "foreign representative" as defined in section 101(24)
of the Bankruptcy Code in respect of the CBCA Proceeding;

(e)  giving full force and effect in the United States to the Canadian Orders,
including any extensions, amendments or modifications thereof approved by
the Canadian Court and the Recapitalization Plan pursuant to sections 105,
1501, 1507, 1521, and 1525 of the Bankruptcy Code; and

(f)  awarding the Foreign Representative such other and further relief as this Court
deems just and proper.

## BASIS FOR RELIEF REQUESTED

### A.    The Chapter 15 Cases Concern a "Foreign Proceeding"

29.    The CBCA Proceeding is a "foreign proceeding" as defined in the Bankruptcy

Code.  Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as

> a collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets
> and affairs of the debtor are subject to control or supervision by a
> foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

30.    The Debtors commenced the CBCA Proceeding on October 31, 2016 and, on the

same day, obtained the Preliminary CBCA Order from the Canadian Court officially

commencing the CBCA Proceeding and granting certain relief.  As discussed in the Martel

Declaration, the CBCA Proceeding is a judicial proceeding brought under the CBCA in British

Columbia, Canada and is supervised by the Canadian Court.  The arrangement provisions of the

CBCA allow CBCA companies to carry out a wide array of novel, complex or unique

transactions by way of plan of arrangement. CBCA arrangement provisions have been used as a

controlled reorganization procedure that enables financially distressed companies to restructure

and/or compromise certain debt obligations in order to maximize the company's value as a going

concern for the benefit of creditors and other parties in interest. The CBCA includes provisions

that permit arrangements that provide for the adjustment of debt under which companies may

effect reorganizations.

31.    Here, the CBCA Proceeding involves an arrangement that restructures the claims

and interests of the Noteholders and the equity holders of CPC with the oversight of the

Canadian Court.  Like certain "prepackaged" bankruptcy cases in the United States, the claims of

all other creditors, including employees, litigants, trade vendors, licensors and other contract

counterparties are unaffected by the Recapitalization Plan (and also would be unaffected by the Acquisition Plan).  Accordingly, the Company will continue to pay such creditors in the ordinary course.

32.      Furthermore, the Recapitalization Plan under the CBCA Proceeding is "collective" in nature because it "typically requires the approval of the corporation's board of directors and any affected stakeholders (depending on the circumstances, the shareholders, or other security-holders of the corporation), and must be judicially determined to be 'fair and reasonable' to be approved by a Court."  Martel Declaration ¶ 9; In re ABC Learning Ctrs. Ltd., 445 B.R. 318, 328 (Bankr. D. Del. 2010) ("A proceeding is collective if it considers the rights and obligations of all creditors."), aff'd, 728 F.3d 301 (3d Cir. 2013); In re British Am. Ins. Co., 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010) ("For a proceeding to be collective within the meaning of section 101(23), it must be instituted for the benefit of creditors generally rather than for a single creditor or class of creditors.").  Courts addressing whether a proceeding is "collective" look to such proceeding's consideration of creditors in general.  In contrast, non-collective proceedings such as foreclosure proceedings, for example, are instituted to protect the rights of a single, secured creditor.  In re Betcorp Ltd., 400 B.R. 266, 281 (Bankr. D. Nev. 2009); see In re ABC Learning Ctrs., 445 B.R. at 334–35 (using the term "all creditors" to mean creditors in general).  Thus, provided that a proceeding "contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action," it is "collective" in nature.  In re British Am. Ins. Co., 425 B.R. at 902; see In re British Am. Isle of Venice (BVI), Ltd., 441 B.R. 713, 717–18 (Bankr. S.D. Fla. 2010) (holding that proceeding was collective in nature where all creditors had a right to be heard).

33.    As detailed in the Martel Declaration, the Canadian Court establishes and

supervises the arrangement approval process during the pendency of the CBCA Proceeding.

Any party in interest seeking to object to the arrangement may appeal to, and obtain relief from,

the Canadian Court.  The Canadian Court, through the CBCA Proceeding, is properly exercising

its jurisdiction over the Canadian Debtors and the U.S. Debtors, as provided under section 192 of

the CBCA.  Pursuant to the CBCA, the Debtors have obtained from the Canadian Court the

Preliminary CBCA Order, in which the Canadian Court concludes that the Canadian Debtors and

U.S. Debtors are "party to [the CBCA] Proceedings," and grants a stay for the protection of all of

the Debtors and their assets.  Preliminary CBCA Order ¶¶ 5–7.  Therefore, the Canadian Court is

clearly exercising "control or supervision" over the affairs of the Debtors, for the purpose of

furthering the reorganization of CPC and its subsidiaries.

34.    Additionally, in the Preliminary CBCA Order, the Canadian Court specifically

requests the assistance of the U.S. courts in carrying out the terms of the CBCA Proceeding:

> This Court hereby requests the aid and recognition of . . . any court
> or any judicial, regulatory or administrative body of the United
> States, any state thereof or any other country in the aid of and to
> assist this Court in carrying out the terms of this [Preliminary
> CBCA] Order. All courts, tribunals, regulatory and administrative
> bodies are hereby respectfully requested to make such orders and
> to provide such assistance to the Catalyst Parties as may be
> necessary or desirable to give effect to this [Preliminary CBCA]
> Order], to grant representative status to any of the Catalyst Parties
> in any foreign proceedings, or to assist the Catalyst Parties and
> their respective agents in carrying out the terms of this
> [Preliminary CBCA] Order.

Preliminary CBCA Order ¶ 12.

35.     Moreover, courts in this and other districts have previously recognized that a

Canadian restructuring proceeding under the CBCA constitutes a "foreign proceeding."[6]

Accordingly, the CBCA Proceeding qualifies as a "foreign proceeding" under the Bankruptcy

Code.

### B.      The Chapter 15 Cases Have Been Commenced by an Authorized Foreign Representative

36.     The term "foreign representative" is defined in section 101(24) of the Bankruptcy

Code as

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).  The Preliminary CBCA Order specifically authorizes the Foreign

Representative to commence the Chapter 15 Cases to assist the Debtors and the Canadian Court

in the Debtors' reorganization efforts.  The Foreign Representative, a person within the meaning

of section 101(41) of the Bankruptcy Code, was duly appointed by the Canadian Court to act as

the Foreign Representative pursuant to paragraph 13 of the Preliminary CBCA Order, which

provides as follows:

> [CPC] is authorized to act as the representative or foreign representative (the "Foreign Representative") of any of the Catalyst Parties in connection with these proceedings and with carrying out the terms of this [Preliminary CBCA] Order, for, among other things, the purpose of having these proceedings recognized in any other jurisdiction whether in or outside of Canada (the "Recognition Proceedings"), as necessary, the Foreign Representative is hereby authorized to apply for foreign recognition of these proceedings, as necessary, in any jurisdiction outside of Canada.

---

[6] See, e.g., In re Essar Steel Algoma Inc., Case No. 14-11730 (BLS) (Bankr. D. Del. Aug. 22, 2014); In re Mega Brands Inc., Case No. 10-10485 (CSS) (Bankr. D. Del. Mar. 23, 2010); In re Tembec Indus., Inc., Case No. 08-13435 (RDD) (Bankr. S.D.N.Y. Oct. 31, 2008).

<u>See</u> Preliminary CBCA Order ¶ 13.

37.    Furthermore, "[s]ection 1516(a) of the Bankruptcy Code allows a court to presume that the foreign proceeding is such if the foreign court's order states that it is a foreign proceeding and that the appointed person or entity is a foreign representative." <u>In re Innua Canada Ltd.</u>, No. 09-16362 (DHS), 2009 WL 1025090, at *4 (Bankr. D.N.J. Apr. 15, 2009) (citing 11 U.S.C. § 1516(a)).  Accordingly, CPC is a proper "foreign representative" under the Bankruptcy Code.

### C.    The Chapter 15 Cases Have Been Properly Commenced

38.    The Chapter 15 Cases were duly and properly commenced as required by sections 1504 and 1509 of the Bankruptcy Code by the filing of the Chapter 15 Petitions and the Verified Petition under section 1515(a) of the Bankruptcy Code.  <u>See</u> <u>In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.</u>, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code.").

39.    Next, sections 1515(b) and (c) of the Bankruptcy Code require that a chapter 15 petition be accompanied by

> (i) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; (ii) a certificate from the foreign court affirming the existence of the foreign proceeding and the appointed foreign representative; (iii) if the above two are not available, then any other evidence satisfying the court that the foreign proceeding has been commenced and the foreign representative has been appointed; and (iv) a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

<u>In re Innua Canada Ltd.</u>, 2009 WL 1025090, at *3 (citing 11 U.S.C. § 1515(b)–(c)).

40.     In accordance with section 1515(b)(1)–(2) and (d) of the Bankruptcy Code, the Foreign Representative has submitted evidence of the CBCA Proceeding and the appointment of CPC as the Foreign Representative thereof.  See Chapter 15 Petitions, Item 6, Addendum A.

41.     Further, in accordance with section 1515(c) of the Bankruptcy Code, the Foreign Representative has also filed concurrently herewith the *Statement of Foreign Representative in Support of Chapter 15 Petition for Recognition of Foreign Proceeding*, which contains a statement identifying the CBCA Proceeding as the only foreign proceeding currently pending with respect to the Debtors.  See Chapter 15 Petitions, Addendum A.

42.     Because the Foreign Representative has satisfied the requirements set forth in section 1515 of the Bankruptcy Code, the Chapter 15 Cases have been properly commenced.

**D.     The Court Has Jurisdiction to Recognize the CBCA Proceeding and Grant the Relief Requested**

43.     Pursuant to sections 157(b)(2)(P) and 1334 of title 28 of the United States Code and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012, the Court has jurisdiction to hear and determine chapter 15 cases.

44.     Venue is also proper in this District.  Section 1410 of title 28 of the United States Code instructs that venue of a case brought pursuant to chapter 15 of the Bankruptcy Code may be commenced in the district

> (1) in which the debtor has its principal place of business or principal assets in the United States;
>
> (2) if the debtor does not have a principal place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in Federal or State court; or
>
> (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the

> convenience of the parties, having regard to the relief sought by the
> foreign representative.

28 U.S.C. § 1410.

45.     As detailed further in the Gibson Declaration, certain of the Debtors' principal

assets in the United States are located in this District.  For certain other of the Debtors, venue in

this District serves the interests of justice and provides convenience for the parties, consistent

with the requirements of 28 U.S.C. § 1410(3).

46.     A debtor has "principal assets" in a district if it has more than half of its assets in

such district.  See Bavelis v. Doukas (In re Bavelis), 453 B.R. 832, 869 (Bankr. S.D. Ohio 2011)

(holding that a debtor had principal assets in the Southern District of Ohio where "more than

50% of [its] assets" were located in such district); In re Shelton, No. 01-20655, 2001 Bankr.

LEXIS 2213, at *19 n.15 (Bankr. D. Idaho Oct. 12, 2001) (noting that principal assets

requirement is met by "a simple determination of where the greater dollar value of all property of

the estate is located"); Frank v. Neufeld (In re Neufeld), No. 12-02177, 2012 Bankr. LEXIS 5430

(Bankr. M.D. Pa. Nov. 16, 2012) (same).  But cf. In re Mid Atl. Retail Grp., Inc., No. 07-81745,

2008 Bankr. LEXIS 790 (Bankr. M.D.N.C. Jan. 4, 2008) (ruling that principal assets existed in a

judicial district even when debtor only had 19% of its assets in the district).

47.     As described in the Gibson Declaration, Debtor CPC's primary asset in the United

States is its 100% equity ownership of Debtor Catalyst Paper Holdings Inc. ("Catalyst Paper

Holdings"), a Delaware holding corporation through which the Debtors conduct substantially all

of their operations in the United States through certain operating subsidiaries.  Pursuant to

applicable Delaware law, the Debtors' ownership of the stock of Catalyst Paper Holdings is

considered located in Delaware for venue purposes.  See 8 Del. C. § 169 ("For all purposes of

title, action, attachment, garnishment and jurisdiction of all courts held in this State, but not for

the purpose of taxation, the situs of the ownership of the capital stock of all corporations existing under the laws of this State, whether organized under this chapter or otherwise, shall be regarded as in this State."); see also In re Global Ocean Carriers Ltd., 251 B.R. 31, 38 (Bankr. D. Del. 2000) (concluding that under Delaware law, a chapter 11 debtor that owned the capital stock of a Delaware corporation owned property in Delaware).  The Debtors also collectively hold an interest in a $50,000 retainer that is held by the Debtors' counsel in a Delaware bank account on behalf of all the Debtors associated with this matter.[7]  Gibson Declaration ¶ 12.  Therefore, CPC and Catalyst Paper Holdings have their principal U.S. assets in Delaware, and venue for each of the Debtors is proper in Delaware pursuant to section 1410 of title 28 of the United States Code.[8]

### E.    The CBCA Proceeding Should Be Recognized as a Foreign Main Proceeding

48.    Chapter 15 of the Bankruptcy Code applies where assistance is sought in the United States by a foreign representative in connection with a foreign proceeding.  See 11 U.S.C. § 1501(b)(1).  Two of the objectives of chapter 15 of the Bankruptcy Code are the "fair and efficient administration of cross-border insolvencies that protects the interest of all creditors, and other interested entities, including the debtor," and the "protection and maximization of the value of the debtor's assets."  11 U.S.C. § 1501(a)(3) and (4).  The Chapter 15 Cases have been commenced for the purpose of obtaining the assistance of this Court to ensure the effective and economical administration of the CBCA Proceeding by, among other things, entering the Recognition Order so that the relief granted by the Canadian Court will apply with respect to the

---

[7] See, e.g., In re Indep. Eng'g Co., 232 B.R. 529, 533 (B.A.P. 1st Cir.) (holding that corporate debtor retained an interest in the unearned portion of its attorneys' retainer as of the commencement of the debtors' chapter 11 case such that the retainer became property of the estate); In re Octaviar Administration Pty Ltd., 511 B.R. 361, 373–74 (Bankr. S.D.N.Y. 2014) (noting that a chapter 15 debtor had property in the United States in the form of a retainer prior to filing a chapter 15 petition); In re Global Ocean Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000) (holding that chapter 11 debtors had interest in escrow funds paid as a retainer to U.S. counsel).

[8] Given the decentralized nature of the U.S. Debtors' operations in the United States across multiple states, the Foreign Representative submits that venue in this District is also consistent with the interests of justice and the convenience of the parties pursuant to 28 U.S.C. § 1410(3).  Further, venue in this District comports with the expectations of creditors given the Debtors' previous 2012 Chapter 15 Proceeding, discussed in greater detail above.

Debtors' assets in the United States.  In particular, recognition of the CBCA Proceeding furthers

the important objective of protecting and maximizing the Debtors' material assets used in the

Debtors' U.S. business operations.

49.      Section 1517(a) governs the Foreign Representative's request for entry of the

Recognition Order.  Section 1517(a) provides:

> Subject to section 1506, after notice and a hearing, an order recognizing a foreign
> proceeding shall be entered if —
>
> (1) such foreign proceeding for which recognition is sought is a foreign
> main proceeding or foreign non-main proceeding within the meaning of
> section 1502;
>
> (2) the foreign representative applying for recognition is a person or body;
> and
>
> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a) (emphasis added).

50.      The Bankruptcy Code also provides that a foreign proceeding is a "foreign main

proceeding" if it is pending in the country where the debtor has its center of main interests.  See

11 U.S.C. §§ 1502(4), 1517(b)(1).  While the Bankruptcy Code does not define "center of main

interests," it provides a presumption that, absent evidence to the contrary, the debtor's

headquarters is presumed to be the center of the debtor's main interests.  11 U.S.C. § 1516(c);

see In re Irish Bank Resolution Corp. (In Special Liquidation), No. 13-12159 (CSS), 2014 WL

9953792, at *16 (Bankr. D. Del. Apr. 30, 2014) (holding that a debtor's center of main interests

was in Ireland where there was no objection or evidence offered "to rebut the presumption that

[the debtor's] 'center of main interests' is in Ireland"); Bear Stearns, 374 B.R. at 127, 130

(noting that presumption that debtor's center of main interests is the place of its registered office

may be "rebutted by evidence to the contrary").  Additionally, in Bear Stearns, Judge Lifland

stated that:

> [v]arious factors could be relevant to such a determination, including: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

Id. at 128 (citing In re SPhinX, Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).

51.     Courts also take into consideration the expectations of creditors and other interested third parties, as a company's center of main interests must be "ascertainable to third parties." See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.), 714 F.3d 127, 136–38 (3d Cir. 2013) (analogizing a company's principal place of business to its center of main interests); In re Millennium Glob. Emerging Credit Master Fund Ltd., 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011) (same).

52.     Notably, the analysis of a foreign debtor's center of main interests is a flexible one, as "courts do not apply any rigid formula or consistently find one factor dispositive." In re Betcorp Ltd., 400 B.R. at 290.  When applying this totality of the circumstances test, courts "generally equate the center of main interests with the concept of a 'principal place of business' under United States law." See, e.g., In re Millenium Glob., 458 B.R. at 72 (noting that "plain English" meaning of "center of main interests" in American jurisprudence is "principal place of business" and that courts have used such terms "interchangeably").

53.     The center of main interests for the Debtors' enterprise is clearly in British Columbia, Canada.  Richmond, British Columbia, part of the Greater Vancouver Regional District, is the location of the Debtors' headquarters and is the nerve center of the Debtors' management, business, and operations.  Three of the five mills operated by the Debtors are also

located in the province of British Columbia.[9]  The Debtors and their non-Debtor affiliates are

operationally and functionally integrated in many respects, organized under centralized senior

management, and are subject to combined cash management and accounting functions, all based

in and overseen from Richmond.  The following (non-exhaustive) critical functions are

performed for the Debtors and their non-Debtor affiliates out of the Richmond office:

    a.  the operations of the Company are directed from the Company's head office
        in Richmond, B.C.;

    b.  all of the Debtors ultimately report to CPC, which is headquartered at the
        Company's head office in Richmond;

    c.  corporate governance for the Company is directed from Richmond;

    d.  the majority of the officers and half of the directors of the U.S. Debtors are
        based in Richmond;[10]

    e.  strategic operating decisions and key policy decisions for the Company are
        made by the Company's staff located in Richmond;

    f.  the Company's human resources functions are administered from Richmond,
        and all local human resources staff report into Richmond;

    g.  the Company's information technology and systems are directed from
        Richmond;

    h.  mill management and senior staff of the Company regularly attend meetings
        in Richmond;

    i.  all public company reporting and investor relations are directed from
        Richmond;

    j.  the Company's chief executive officer (the "CEO") is based in Richmond,
        and, in addition to the senior management referenced above, all sales,
        manufacturing, operations, and legal staff report to the CEO; and

---

[9] The Foreign Representative acknowledges that the Debtors engage in substantial U.S. operations through their mills in Wisconsin and Maine and maintain scattered support centers at various other locations in the United States. Nonetheless, these operations, particularly given their diffuse nature, do not rise to the level of "critical functions" for purposes of finding the Debtors' "center of main interests."

[10] Only one member of the senior management team, the head of CPC's sales department, is stationed outside of Richmond, in Seattle, Washington.  Each of the US Debtors has two directors, one of which is located in Richmond and the other is located in Seattle.

k.  each of the Debtors has assets in Canada, and all but one[11] of the U.S. Debtors owns and maintains a bank account at a Canadian chartered bank in Vancouver, British Columbia which maintains such funds on deposit.

54.     Furthermore, the Preliminary CBCA Order contains an express finding that "British Columbia is the 'Centre of Main Interest' of [CPC] and its affiliates and subsidiaries, including, but not limited, to the Petitioners and Impleaded Parties."  Preliminary CBCA Order ¶ 14.  Canada is thus "ascertainable by third parties" as the Debtors' center of main interests.

55.     Notably, in connection with the Company's 2012 Chapter 15 Proceeding, the Bankruptcy Court for the District of Delaware found that British Columbia was the center of main interests for the Debtors and recognized the 2012 Canadian Proceeding as a foreign main proceeding.[12]  Accordingly, given that the CBCA Proceeding is pending in British Columbia, Canada, (the Debtors' center of main interests), the CBCA Proceeding should be recognized as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

**F.      In the Alternative, the CBCA Proceeding Should Be Recognized as a Foreign Main Proceeding with Respect to the Canadian Debtors and a Foreign Nonmain Proceeding with Respect to the U.S. Debtors**

56.     In the alternative, the CBCA is at least a foreign nonmain proceeding under the Bankruptcy Code with respect to the U.S. Debtors, and a foreign main proceeding under the Bankruptcy Code with respect to the Canadian Debtors.

57.     A foreign proceeding is a "foreign nonmain proceeding" if it is pending in a country where the debtor has an establishment, which is further defined as "any place of operations where the debtor carries out a nontransitory economic activity."  See 11 U.S.C. §§ 1517(b)(2), 1502(2), 1502(5).

---

[11] Catalyst Paper Operations Inc. does not maintain a bank account in Canada.

[12] See In re Catalyst Paper Corp., Case No. 12-10221 (PJW) (Bankr. D. Del. Mar. 5, 2012), ¶ 2.

58.     As described above, at a minimum, the U.S. Debtors carry out various

nontransitory operation, managerial, financing and other economic activities in Canada.  The

integration of the operations of the U.S. Debtors and the Canadian Debtors, and the dependency

of the U.S. Debtors upon the operations of the Canadian Debtors, support the conclusion that the

economic activities of the U.S. Debtors in Canada are of a nontransitory nature.  The

U.S. Debtors therefore clearly maintain "establishments" in Canada, where the CBCA

Proceeding is pending.  As such, the Bankruptcy Code requirements for recognizing the CBCA

Proceeding as a "foreign nonmain proceeding" under the Bankruptcy Code are met with respect

to the U.S. Debtors.

59.     Furthermore, the filing of the Chapter 15 Cases is intended to ensure an orderly

administration of the Debtors' financial affairs and recapitalization, under the auspices of the

CBCA Proceeding and applicable Canadian law, in a manner that protects the interests of all

creditors.  Therefore, recognition of the CBCA Proceeding supports and promotes the policies of

chapter 15 and the principles of international comity.

60.     It is imperative that no ambiguity exists and that the Canadian Orders apply in full

in the Chapter 15 Cases so that the Debtors' U.S. assets may be administered efficiently and

effectively by the Canadian Court, with the assistance of this Court.  Accordingly, the Foreign

Representative requests, in furtherance of recognition of the CBCA Proceeding, that this Court

give full force and effect to the Canadian Orders.

### G.      Recognition of the CBCA Proceeding Is Consistent with Public Policy

61.     Pursuant to section 1506 of the Bankruptcy Code, even if the requirements for

recognition provided in section 1517 of the Bankruptcy Code are satisfied, recognition can

nevertheless be denied where it would be "manifestly contrary to the public policy of the United

States."  11 U.S.C. § 1506.  This "public policy" exception has been narrowly construed to apply

to only those "matters of fundamental importance to the [United States]." See, e.g., In re

Ephedra Prods. Liab. Litig., 349 B.R. 333, 336 (S.D.N.Y. 2006) (quoting United Nations General

Assembly, Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency,

¶ 89, U.N. Doc. A/CN.9/442 (1997)).

62.    Section 1501 of the Bankruptcy Code sets forth the public policy objective of

cooperation between the courts of the United States and the courts of foreign countries involved

in cross-border insolvency cases.  Section 1525 of the Bankruptcy Code further provides that,

"[c]onsistent with section 1501, the court shall cooperate to the maximum extent possible with a

foreign court or a foreign representative, either directly or through a trustee." These sections

evidence the strong public policy, incorporated into the Bankruptcy Code, in favor of

cooperation between this Court and a foreign court.

63.    Here, nothing regarding the recognition of the CBCA Proceeding contravenes

United States policy.  Indeed, the international coordination of the Debtors' restructuring will

provide an efficient and fair process to all parties in interest while promoting comity and cross-

border cooperation.  Accordingly, section 1506 of the Bankruptcy Code presents no barrier to

entry of the Provisional Relief Order and the Recognition Order.  To the contrary, sections 1501

and 1525 of the Bankruptcy Court lend support for their entry.

64.    Moreover, the policy and principles of international comity will be furthered by

recognition of the CBCA Proceeding and enforcement of the Canadian Orders.  At paragraph 12

of the Preliminary CBCA Order, the Canadian Court specifically requests the aid and assistance

of this Court in giving effect to the Preliminary CBCA Order.

65.     Finally, numerous bankruptcy courts in this district have granted relief similar to the general relief requested in this Verified Petition.[13]  The Foreign Representative submits that such relief is similarly appropriate in this instance.

## NOTICE

66.     Notice of this Verified Petition will be provided to: (a) counsel to the administrative and collateral agents for the Debtors' prepetition ABL Facility and Term Loan; (b)  the indenture trustee for the Debtors' Secured Notes; (c) counsel for each of the Principal Securityholders; (d) the Office of the United States Trustee for the District of Delaware; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; and (g) any other interested parties that have requested notice in these Chapter 15 Cases.  The Foreign Representative will provide notice of the entry of any order granting relief sought in this Verified Petition in the form and manner set forth in the *Foreign Representative's Motion for Entry of an Order Scheduling the Recognition Hearing and Specifying the Form and Manner of Service*, filed concurrently herewith.  The Foreign Representative submits that such proposed notice and service to the parties contemplated therein constitutes reasonable and proper notice under the circumstances, and that no other or further notice is necessary or required.

---

[13] See, e.g., In re Altos Hornos de Mexico, S.A.B. de C.V., Case No. 16-11890 (KG) (Bankr. D. Del. Sept. 30, 2016) (granting final recognition); In re Toshiba Samsung Storage Tech. Korea Corp., Case No. 16-11602 (CSS) (Bankr. D. Del. July 27, 2016) (same); In re LDK Solar Co., Ltd., Case No. 14-12387 (LSS) (Bankr. D. Del. Nov. 21, 2014) (same); In re Essar Steel Algoma Inc., Case No. 14-11730 (BLS) (Bankr. D. Del. Aug. 22, 2014) (same); In re Catalyst Paper Corp., Case No. 12-10221 (PJW) (Bankr. D. Del. Mar. 5, 2012) (same); In re Angiotech Pharm., Inc., Case No. 11-10269 (KG) (Bankr. D. Del. Feb. 22.  2011) (same); In re Mega Brands Inc., Case No. 10-10485 (CSS) (Bankr. D. Del. Mar. 23, 2010) (same).

WHEREFORE, the Foreign Representative respectfully requests (a) after notice and a hearing, entry of the Recognition Order, substantially in the form attached hereto as <u>Exhibit A</u>, and (b) that the Court grant such other relief as is just and proper.

Dated:  November 1, 2016
Wilmington, Delaware

SIDLEY AUSTIN LLP
James F. Conlan (*pro hac vice admission pending*)
Dennis M. Twomey (*pro hac vice admission pending*)
William A. Evanoff (*pro hac vice admission pending*)
Blair M. Warner (*pro hac vice admission pending*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Matthew B. Lunn*
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Ashley E. Jacobs (No. 5635)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Counsel to the Foreign Representative*

## VERIFICATION OF PETITION

Stew Gibson, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States of America as follows:

I am a Vice President of Catalyst Paper Corporation, the duly appointed proposed foreign representative of the Debtors.  As such, I have full authority to verify the foregoing Verified Petition on behalf of the Debtors.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

Dated: __November 1__ , 2016

_____
By: Stew Gibson
Title: Vice President of Catalyst Paper Corporation
Authorized Foreign Representative of the Debtors

**<u>Exhibit A</u>**

**Proposed Recognition Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CATALYST PAPER CORPORATION, et al.[1] | Case No. 16-12419 (CSS) |
| Debtors in a foreign proceeding. | (Jointly Administered) |

**ORDER GRANTING FINAL RELIEF FOR**
**RECOGNITION OF A FOREIGN MAIN PROCEEDING**

This matter coming before the Court on the chapter 15 petitions and the *Verified Petition*

*for Entry of an Order Recognizing Foreign Main Proceeding and Granting Additional Relief*

(together, the "Verified Petition")[2] of Catalyst Paper Corporation ("CPC"), in its capacity as the

authorized foreign representative (the "Foreign Representative") for itself and the above-captioned

debtors (collectively, the "Debtors" and, together with their non-debtor affiliates, the "Company")

in a proceeding (the "CBCA Proceeding") under Canada's *Canada Business Corporations Act*,

R.S.C. 1985, c. C-44 (as amended, the "CBCA") pending before the Supreme Court of British

Columbia (the "Canadian Court"); and upon the Gibson Declaration, the Martel Declaration, and

the Memorandum of Law; and having considered the statements of counsel with respect to the

Petitions at a hearing before this Court (the "Hearing"); and the Court having jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from*

---

[1] The chapter 15 debtors incorporated in Canada and/or in the province of British Columbia (collectively, the "Canadian Debtors"), along with the last four digits of each Canadian Debtor's Canadian business number, are: Catalyst Paper Corporation (1171); Catalyst Paper (6288); Catalyst Pulp Operations Limited (4565); Catalyst Pulp Sales Inc. (4021); Catalyst Pulp and Paper Sales Inc. (2085); and Pacifica Poplars Ltd. (6048). The chapter 15 debtors incorporated in the United States (collectively, the "U.S. Debtors"), along with the last four digits of each U.S. Debtor's federal tax identification number, are: Catalyst Paper Holdings Inc. (7177); Catalyst Paper Operations Inc. (7105); Catalyst Paper (Snowflake) Inc. (7015); Catalyst Paper (USA) Inc. (6890); Pacifica Papers US Inc. (7595); Pacifica Papers Sales Inc. (7594); Pacifica Poplars Inc. (9597); and Catalyst Paper Recycling Inc. (8358). The Canadian Debtors and the U.S. Debtors are referred to herein, collectively, as the "Debtors." The Debtors' executive headquarters are located at: 2nd Floor, 3600 Lysander Lane, Richmond, BC V7B 1C3, Canada.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Verified Petition.

*the United States District Court for the District of Delaware*, dated February 29, 2012; and this

matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this

proceeding and the Verified Petition in this district being proper pursuant to 28 U.S.C. § 1410; and

appropriate notice of and the opportunity for a hearing having been given; and the relief requested

in the Verified Petition being necessary to preserve the value of the Debtors' assets and business

and  in the best interests of the Debtors' estates, their creditors and other parties in interest; and the

Court having determined that the relief requested in the Verified Petition is consistent with the

purpose of chapter 15 of the Bankruptcy Code and that the legal and factual bases set forth in the

Verified Petition establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND

CONCLUSIONS OF LAW:

A.       The findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact

constitute conclusions of law, they are adopted as such.  To the extent that any of the following

conclusions of law constitute findings of fact, they are adopted as such.

B.       CPC is a person within the meaning of section 101(41) of the Bankruptcy Code and

is the duly appointed foreign representative of each of the Debtors within the meaning of section

101(24) of the Bankruptcy Code.

C.       These Chapter 15 Cases were properly commenced pursuant to sections 1504 and

1515 of the Bankruptcy Code.

01:19474181.1

2

D.      The Chapter 15 Petitions meet the requirements of section 1515 of the Bankruptcy Code and the Chapter 15 Cases were properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

E.      The Foreign Representative has satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 2002(q).

F.      The CBCA Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

G.      The CBCA Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

H.      British Columbia, Canada is the center of main interests for each of the Debtors, including, but not limited to, the U.S. Debtors.

I.      The CBCA Proceeding pending in the Canadian Court, in the location that is the Debtors' center of main interest, constitutes a foreign main proceeding pursuant to section 1502(4) of the Bankruptcy Code and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

J.      The Foreign Representative is entitled, to the extent not inconsistent with the Final Order, to all of the relief provided pursuant to section 1520 on the Bankruptcy Code, except as otherwise set forth herein.

K.      All creditors and other parties in interest are sufficiently protected in the grant of the relief ordered hereby in compliance with section 1522(a) of the Bankruptcy Code.

L.      The relief granted herein is necessary and appropriate, in the interest of the public and international comity, consistent with the public policy of the United States, warranted pursuant

to sections 105(a), 1517, 1519, 1520, 1521 and 1522 of the Bankruptcy Code, and will not cause

any hardship to any party in interest that is not outweighed by the benefits of the relief granted.

Based on the foregoing findings of fact and conclusions of law, IT IS HEREBY

ORDERED THAT:

1.      The Verified Petition is GRANTED as set forth herein.

2.      The CBCA Proceeding is hereby recognized as a "foreign main proceeding"

pursuant to section 1517(b)(1) of the Bankruptcy Code, and orders that have been or will be made

or entered therein are hereby recognized for all purposes under chapter 15 of the Bankruptcy Code,

regardless of whether expressly discussed below.

3.      CPC is the duly appointed foreign representative of the Debtors within the meaning

of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Debtors during

the Chapter 15 Cases.

4.      The Canadian Orders, including any extensions or amendments thereto and the plan

of arrangement approved thereby, are hereby enforced and recognized on a final basis and given

full force and effect in the United States.

5.      All relief afforded a foreign main proceeding pursuant to section 1520 of the

Bankruptcy Code is hereby granted without limitation, except as set forth in this paragraph.

Specifically, (x) the automatic stay provisions of section 362 of the Bankruptcy Code shall operate

as a stay of any execution against any property of the Debtors by the Trustee or the Noteholders

within the territorial jurisdiction of the United States or, to the maximum extent permitted under

applicable law, any other jurisdiction where this Court's orders are enforceable, and (y) the

provisions of section 365(e) of the Bankruptcy Code shall apply with respect to the Debtors and no

counterparty to any of the Debtors' contracts or leases shall terminate or suspend any such contract

or lease based solely upon the Debtor's commencement of the CBCA Proceeding or these Chapter 15 Cases.  Notwithstanding anything to the contrary in this Order, neither this paragraph nor any of the relief pursuant to section 1520 of the Bankruptcy Code shall apply in any manner, whether directly or indirectly, to the Agent and the Lenders, or any of them, or to any other Person acting on their behalf, including the Collateral Trustee, including under or in connection with the ABL Credit Agreement, the Term Loan Credit Agreement, any other Loan Document or applicable law related thereto .

6.     Upon entry of this Order neither the Trustee,  the Noteholders nor any person acting on their behalf, shall have the right to make, commence, or enforce any rights, claims or remedies in respect of or arising from any obligations under the Indenture and related  guarantee, security and other documents to which the Debtors are party.  Notwithstanding the foregoing, this paragraph shall not apply in any manner, whether directly or indirectly, to the Agent and the Lenders, or any of them, or to any other Person acting on their behalf, including the Collateral Trustee, including under or in connection with the ABL Credit Agreement, the Term Loan Credit Agreement, any other Loan Document, or applicable law related thereto.

7.     Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding against any party to the extent set forth in sections 362(b) or 1521(d) of the Bankruptcy Code.

8.     No action taken by the Foreign Representative, the Debtors, or each of their successors, agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the CBCA Proceeding, the Canadian Orders, the plan of arrangement approved thereby, this Order, or the Chapter 15 Cases or any adversary proceeding therein, or any further proceeding commenced thereunder, shall

be deemed to constitute a waiver of the immunity afforded such person under sections 306 and 1510 of the Bankruptcy Code.

9.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Foreign Representative is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Foreign Representative is authorized and empowered, and may in its discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

10.      A copy of this Order, conformed to be true and correct, shall be served, within three business days of entry of this Order, by facsimile, electronic mail or overnight express delivery, upon all persons or bodies authorized to administer foreign proceedings of the Debtor, all entities against whom provisional relief was granted under section 1519 of the Bankruptcy Code, all parties to litigation pending in the United States to which the Debtor was a party at the time of the filing of the Petition, the United States Trustee and such other entities as the Court may direct.

11.      Such service shall be good and sufficient service and adequate notice for present purposes.

12.      This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through the Chapter 15 Cases, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

Dated:  November _____, 2016
Wilmington, Delaware                    _____

                                        UNITED STATES BANKRUPTCY JUDGE